Your Honor, may it please the Court, Robert Ring on our behalf of Mr. LaCoste. I would like to start off by addressing the first issue we raised, which is the breach of the plea agreement. And the issue was first whether or not, in fact, there was a breach of the plea agreement. The Court below and the government seem to distinguish 11C1B and 11C2B. And I'm not sure that was a fact that you agreed on the record that there was no breach of the plea agreement. LaCoste I'm sorry, I couldn't hear you. Kagan That you agreed on the record that there was no breach of the plea agreement. Why are you with that? LaCoste I don't think I ever agreed on the record there was no breach of the plea agreement. On page 33 of the transcript, the Court asked me if I was waiving my right to appeal the initial breach. Kagan But later, later than that. LaCoste Later, the Court, I said that in court the government correctly followed the agreement, but it was a little too late. And then I withdrew the first paragraph, but there's still the second paragraph of my objection, which basically indicates that I believe we should be entitled to appeal. Kagan I'd like to thank Mr. Bradford. I think his statement satisfies the agreement we entered into. That's all I was asking for. Are you withdrawing the paragraph of the sentencing memorandum? Sure. That's a yes, yes. You're withdrawing that paragraph, yes. LaCoste Well, there's two paragraphs. I didn't see any harm in withdrawing the first paragraph when I'm still arguing in the second paragraph that there was a violation of the pleach agreement. You know, I would indicate that in 40 years of practicing criminal defense, I've never had a judge take a recess and call somebody who potentially controls my livelihood as a member of the CJA panel to get me to agree to a particular position. So, you know, I understand I was trying to cut a fine line there, because obviously the Court made it clear I didn't understand what the Court was getting at originally when it started talking about 11c and 11b, because I don't think it's an issue. But I tried to make it clear the government had breached the plea agreement. Kagan I really am mystified. You said you're withdrawing paragraph 1. Paragraph 1 is the government's sentencing memorandum constitutes a violation of the plea agreement. So what did you not withdraw? LaCoste Paragraph 2 says the same thing. Kagan Well, but the Court said it. LaCoste All right. Well, if she asked me to withdraw that part. Kagan Sorry. Paragraph, clearly what she meant by paragraph 1 and what I would have meant by paragraph 1 and what I would have assumed you meant by paragraph 1 is the paragraph says number 1, as to which the headline is the government's sentencing memorandum constitutes a violation of the plea agreement. LaCoste Well, I misunderstood then, because I assumed she was saying do you want to withdraw paragraph 1 of that, that heading 1, and that's what she said, paragraph, not heading 1. Kagan Oh, come on. LaCoste All right. Well, I'm sorry if the Court disagrees with my analysis of that. Kennedy To reading the plain words. LaCoste Yes. I understand. But at that point, I disagree with the plain words. The plain words indicate that I withdrew paragraph 1. There's still paragraph 2, and that was my thinking at the time. I indicated clearly that I wasn't giving up any right to appeal the breach that was done when they filed their sentencing memorandum. When I, on page 33, the Court asked me to waive it, and I said I'm not waiving anything. I don't want to waive my right to appeal. Kagan I thought you said whether I waive it or not will depend on what he actually says. LaCoste Pardon? Kagan I thought you said not until I hear what he says. And then when you heard what he says, you said you were withdrawing it. LaCoste No. I said the Court asked me to affirmably waive your right to appeal the issue of the violation of the plea agreement. Kagan If they comply, that's great. I'll be happy. I'll say they complied. Then I'll come back and ask you. I'll come back and ask you when he makes his comments. And then you did. Anyway, is this really not a way to deal with the Court? I mean, in terms of at the very, very best, you were hiding balls, many balls, as to what anybody would think you were saying. Scalia There's repeated offers saying if you think I've breached it, fine. I'll let you withdraw the guilty plea. The judge said, sure, I'll let you withdraw the guilty plea. If you really think there's a breach, let's just try the case. And that happened how many times? LaCoste Lots of times, but that wasn't what we wanted. We asked specifically in paragraph 2, we want a specific performance. Now, the judge made it clear she's not going to grant a ---- Kennedy You got specific performance. LaCoste No. Kennedy He stood up there about, I've forgotten how many times, and said, we're sticking with the, what, 36 months, whatever the agreement was. He said that a dozen times, and the judge says, tough, I'm not going along with that. LaCoste I understand the Court's comments, but I don't think that's what occurred. I think ---- Kennedy Well, I think they, you know, subliminally at least said the words, but they didn't give the Court any reason to actually give a 36-month sentence. Kagan They did, they did, quite specifically, which is they couldn't prove anything more than that. They couldn't prove what the pre-sentence report was recommending. They couldn't prove the details. LaCoste Well, they took a completely different tact. Our position the whole time was that, and it says in the factual statement, which I wrote specifically, that Mr. LaCoste didn't commit any crime until September of 2007, when he began to realize that the company was in physical trouble, and then he continued to put out these PPMs with these statements that he should have known were in doubt. So then the government comes back and just basically says, instead of our agreement, which would have justified a 36-month sentence, basically comes back and said, no, he defrauded all these people, he cheated everybody, he's a liar, he committed this crime from the very beginning, they never intended to have a business. And the whole purpose of writing the statement of facts and getting the government to agree to that was I knew the Court wouldn't accept a 30-month sentence if that was the case. The case was that he intended to start a business, he did that, the economy crashed in 2007, they could no longer get traditional real estate financing, they had no financing, they couldn't move forward. He continued to hope he would get financing, but it didn't happen. So, you know, that's what we argued for. And then the government comes in and basically says that didn't happen. And I think we deserve what we argued for and the government to support that. But I understand the Court may disagree with that. Okay. Is there anything else you want to add? I must say that I am somewhat interested in the supervised release internet limitation in a generic way. It seems to me at this point in the development of technology to say somebody can't use the internet is like saying they can't use the telephone. And I don't know if there was any specific justification given for that here. You know, that was a surprise. There was no recommendation by the probation office. And in fact, to be honest, I didn't even hear it when she said it. And she never mentioned anything outside of saying it, ordering it when she made the terms of supervised release. So I don't think there is any discussion of why she decided to make an internet ban outside of she did that. And, you know, the better practice obviously would have been to tell counsel ahead of time so we could have addressed the issue. Is there any record about the use of computers in this crime? I mean, was it just, I mean, routine use of computers, i.e. sending people e-mails and stuff? That's what I argued. I argued it was just transcendental related to this crime because there wasn't any specific use of computers outside of we use computers in everyday life. The crime involved sending out PPMs, which were proposals to individuals who read them and made a decision whether or not to invest. Now, you know, afterwards there was communication by the internet, as there always is, but the crime could have been easily done by mail, just what was done by internet. Yeah. And nothing to do with it being the internet in particular. No, not at all. It wasn't a total ban, was it? I mean, as I understand what she said, you have to get prior approval from the probation office, and then further, she said, when you finally get out of jail, ask me to revisit this. True? Those are true statements, yes. So it wasn't a total ban? Well, I disagree, but I think it is a total ban, and, you know, even if it can be addressed later, you know, without support, it shouldn't have been imposed, and I think we should be allowed to challenge it without having to go out and violate it and come back and challenge it later. Well, you don't have to violate it. I mean, she seemed to be saying that she was contemplating with some sort of monitoring system or something later on. So it may be premature, but it's — Well, maybe if we had a record, we would understand that, but the problem is there is no record. I have 14 seconds. Okay. I'll be a minute in rebuttal. Thank you. You'll be a minute in rebuttal. Good morning, Your Honor. Scott Bradford on behalf of the United States. I'd like to start with the waiver argument that the Court addressed and defense counsel addressed a moment ago. I think it's fairly clear on the record that the defendant, through his counsel, did waive the breach of the plea agreement argument after the government argued and made its sentencing recommendation. The defendant thanked the government for making the recommendation and said that the government had satisfied the agreement and then withdrew that argument from his sentencing memorandum. I think what's happening here today may just be mincing words or wordsmithing a little bit. I think it was fairly clear to everybody at the hearing. Even if it weren't waived, as a matter of fact, there was no breach that I could see. I agree. And the district court also agreed. If the court looks at ER 160, the district court found that there was no breach. And, in fact, I was the prosecutor who handled that sentencing hearing, and I made clear to the district court that I disagreed with the PSR findings. There's been some mention of the government's sentencing memorandum and the facts alleged in the memorandum, and I want to be clear that that was to mitigate rather than aggravate, because if the court looks at the offense conduct listed in the PSR it listed a lot of offense conduct that the government simply could not prove. And so I wanted to be clear to the district court what the conduct at issue really was. And I did copy, I plagiarized our own work, defense counsel's and my work, the joint statement of facts is what really supplied the basis for the offense conduct in the government's sentencing memorandum. So, again, I would argue that the breach argument has been waived and cannot be erased on appeal at this time. What about the conditions laid out by, during his supervised release? He's been essentially banished from the four counties and told that he couldn't use the internet without prior permission. There are two limitations, or there are two restrictions, yes, Your Honor. There is the limitation on his internet use, and then there is also the post-release residency limitation, which essentially said, or the district court essentially said, as listed in the judgment and commitment order, that he cannot reside in four central counties here in Oregon without prior approval of the probation officer. And what was the reason for the second? I mean, Sandringham was more, it wasn't so much for his benefit as that everybody was going to be upset with him and they shouldn't have to deal with him. I believe the district court in the transcript or at the hearing listed a few reasons for that. Yes, Your Honor, the first part was to deal with the issues created in that small-knit community created by this defendant or through this offense conduct.  Sotomayor, Jr.: A small-knit community is usually not four counties big. That is correct, Your Honor. It is four counties, and it's — I used to live in Eugene, and so I say small in the sense that there's some rural aspects to this, to those four counties. I would note, though, that the district court also had other facts and evidence in front of her when she made this limitation. The fraud was perpetrated in these four counties. There are victims who live in these four counties. The defendant grew up in Albany, in Lynn County, one of the four counties. He was a coach and a teacher in Lynn County, and he used his stature, his stature in those communities to commit his fraud, in a sense. I gathered during the sentencing hearing with the character witnesses that the animosity within the communities was demonstrated, or did I read that wrong? You did not read that wrong. It was a fairly intense sentencing hearing when the victims gave their victim impact statements and when the defense character witnesses addressed the court. There was palpable tension in the courtroom, and the district court felt that. But those people were going back to their houses, so if they were angry with each other, they would be angry for each other the whole time he was in prison. They are. I think it's important to note the standard here, that the conditions of supervised release don't necessarily need to be related to the offense of conviction, but they have to be related to the purposes of supervised release, that is, rehabilitation, deterrence, and protection. And if they infringe upon a liberty interest, they must be tailored. They can't be reasonably greater than necessary to achieve the goals of supervised release. And I think Judge Aiken, during the sentencing hearing, gave some concern. She was worried about the defendant going back to that community and being the same old bad guy with the same old bad behaviors, that he needed a fresh start. He needed to start a new life somewhere else. So she was concerned about those purposes of supervised release, deterrence, rehabilitation, and protection of the public. As the Court noted, there was tension in that courtroom. There's palpable tension in those communities between the defendant and his supporters and the victims of the crime. And what about the Internet? I mean, is that – what is the record here about the use of the Internet? Do we use it for anything but ordinary communications? As noted in the joint statement of facts, the defendant did use facilities of interstate commerce, including the Internet, to commit his crime. Telephone, mail? We didn't stop him. Specifically, Internet and e-mail, Your Honor, yes. And I concede that that is a traditional manner in which we all communicate now. No, it seems to me that maybe we've just got to stop doing this, because, i.e., putting special Internet conditions on our list, there's a reason. I mean, this was not a computer crime as such, right? It was a traditional securities fraud case that used the Internet to facilitate the fraud. The mail, he used the phones. Correct. Right? Correct. But we're not banning him from the mails and the phones. No, the Court didn't do that. The Court also did make the use of the Internet. Could she? Could she tell him he couldn't use the mail? Well, I think it's we need to be clear here that this is not a condition that's an outright ban of Internet usage. It's subject to prior approval. But it also wasn't clear what it is, i.e., whether he has to go back every time he wants to send an e-mail to his probation officer, could I send this e-mail over the Internet, or what exactly? That is true that the procedures weren't specifically outlined through the condition, but I think it's, it's. In the other cases, there were specific monitoring provisions, and that, this was just completely amorphous, and for all one can tell, he can't send an e-mail until he calls up his probation officer. I concede that point to the Court. Based on my experience, these conditions are instituted as such that the defendant cannot use the Internet without prior approval of the probation officer, and then the probation officer and the defendant work out what those limitations may or may not be. And I think it's also important to note that. What if he said he couldn't use a telephone? Would that be okay? I think the Court. Unless you get permission from your probation officer. I think the Court would have to have some sort of basis in order to do that. What's the basis? That's different from the telephone in this case. Well, here in this case, I think it's important to note that he used the Internet, his website, to facilitate his fraud, and he also sent e-mails, as defense counsel noted, putting forth these. He also used the telephone, and he also used the mails. He did. Right. So that's what I'm asking you. Could she say he can't use the telephone until you unless your probation officer agrees? Perhaps she could if there was a sufficient basis, Your Honor. I think here in this case, the record does support the basis for the imposition of this condition of supervised release. And he used the Internet. He used the Internet, e-mail communications to perpetrate his fraud. Yes. He used the telephone and he used the mail. So therefore, she could stop him from using all three. I just don't understand. I mean, I think that the case law in this area, you know, began at a time when it was somewhat unusual to be using the Internet to do things. But at this point, you know, and even the – I think one of the main cases you're relying on is from 2011, about an earlier time period. But at this juncture, I don't understand. You didn't suggest this provision, right? I did not. And the probation officer didn't either. I do not believe so. So, I don't know. I'm troubled. I understand the Court's troubled. But if the Court comes back to the standard of review here, district courts are given wide discretion to impose such conditions as long as there is a sufficient basis. And I think the record supports that here.  A sufficient basis being that he used the Internet and he wrote e-mails. Well, he conceded in his statement of facts that he used the Internet to facilitate his fraud. The judge was careful to explain about the banishment. Is there something that she was equally – gave an equal explanation for the ban on the Internet? I'm sorry, I didn't catch the first part. Did she say why she did the ban on the Internet, as she did for the banishment from the counties? She talked about Internet postings at ER 171. There were some postings on the Internet that were creating what she felt were escalating the issues within the community. And she talks about those postings as being something that she needed to consider when she was fashioning, I believe, these conditions of supervised release. And that, again, would go to the purposes of supervision, rehabilitation, protection, deterrence. I could see her saying, you can't do that anymore. But when you start saying you can't use it, you can't Google? She didn't say that, Your Honor. What she said was the – You can't use the Internet unless you get prior approval. Correct. That sounds kind of absolute to me. But it doesn't mean that the probation officer would deny that privilege. But he might. And if he does, we all know that the defendant then has the right to appeal that to the district court to get specific guidance, which is how the cases typically read. It doesn't seem exactly clear that he has to guess at what he can use the Internet for. I see that I'm almost out of time. Well, you're out of time. I am out of time. This final comment, Your Honor, based on my experience of seeing these conditions come through, that the defendant can't use the Internet or something like that without prior approval. And as I noted a moment ago, typically the defendant and the probation officer work out the nuts and bolts of that limitation. But it's narrowly tailored to you. You can't use the Internet to advertise, to seek partnerships, to revisit his crime. And then the rest of it, fine. You want to look at what Wikipedia says, that's all right. But it just seems that it could have been more narrowly tailored to me. While it could have certainly been more or better tailored to the situation. Well, how about should have? I think the standard of review here supports the district court's issuance of this condition of supervised release. Okay. Thank you very much, Your Honor. The government submits. I would just like to make two quick points. One, I disagree. I think there was a clear breach of the plea agreement by the government sentencing memorandum under Morales Heredia, Judge Orgelau's opinion. And I argued that, and I think there's a clear breach. So I disagree there was no breach. Secondly, the government indicated there was hostile tension in the courtroom. I was there. I don't know what they're talking about, hostile tension. There were 40 or 50 people there who supported Mr. LaCoste. There was one person from the community, Ms. Martin, who testified. That was all. There wasn't any hostile tension there. Secondly. Those people were going back to wherever they came from, and if they were hostile, they were hostile to each other. Right? So it has nothing to do with Mr. LaCoste. I mean, he's going off to prison for three years. So the, yeah. But, yeah, I'm just saying there was, I don't, I didn't see any, there was nobody there that was upset on the other side. Do you give us some sense of the physical reach of this area that the ban covers? I mean, are we talking, you know, from one end to another, is it 100 miles or how much is it? More than that, obviously. It covers quite a large area. Marion County by itself is quite large, includes Salem. Lane County is somewhat narrow and long. But the point is, and also, this conduct occurred in other counties. It occurred in Multnomah County. It occurred in many different counties. So I don't see it being related to that particular area either. That's the other point I want to make. And one other thing that Judge Walter mentioned, posting on the Internet the comment the judge made, I don't know what she's talking about. And that's why I brought up, I tried to bring up what other information she had outside of court so I could address it. Because I don't know anything about postings on the Internet. I don't know where she got those comments. So I think that just ties into, I should have been allowed to know what she had to consider. Okay. Thank you both very much. The case of United States v. Acosta submitted. We will go to Bravo v. Taylor.
judges: Berzon, Watford, Walter